[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON REQUEST FOR MANDAMUS
The subject of this action very briefly stated arises out of the nomination and endorsement by Mr. Hamad, a member of the ACP (A Connecticut Party), of Mr. Nielsen as the ACP candidate for the 24th Senate District. A complaint was made regarding the endorsement and the CT Page 9018 executive committee of the ACP met pursuant to party rules and invalidated Mr. Nielsen's endorsement and wrote a letter to the secretary of the state indicating they took that action. Because of that letter, the secretary has refused to place Mr. Nielsen's name on the ballot as the ACP endorsed candidate since she concluded Mr. Nielsen was not the party endorsed candidate.
This is a mandamus action brought against the secretary of the state seeking an order in mandamus requiring the secretary to place the plaintiff Nielsen's name on the official ballot as ACP nominee for the 24th Senate District for the election scheduled for November 8, 1994.
Mandamus relief has been described as an extraordinary remedy granted only in the court's sound discretion for compelling circumstances, Lahiff v. St. Joseph's TotalAbstinence, 76 Conn. 648, 651 (1904), Simmons v. Budd,165 Conn. 507, 515 (1973). Ordinarily mandamus will not lie where there is an adequate remedy in law or equity.Hartford v. American Arbitration Association, 174 Conn. 472,476 (1978), Milford Education Association v. Board ofEducation, 167 Conn. 513, 519 (1975). It is an appropriate remedy where (1) the duty to be performed is ministerial, (2) the party applying for the writ has a clear legal right to have the duty performed, and (3) there is no other adequate remedy, Monroe v. Middlebury ConservationCommission, 187 Conn. 476, 480-481 (1982). This case quoted with approval the following language "If the (plaintiff) is entitled to relief, it is not of great importance whether we grant the relief by way of the legal writ of mandamus or the equitable remedy of injunction or by a combination of both," In re Alexander, 243 A.2d 901,903 (D.C.App., 1968).
State ex rel Golembeske v. White, et al., 168 Conn. 278,283 (1975) added a further refinement to the admonition that mandamus will lie only to enforce ministerial not discretionary duties. That case at page 284 said: "More precisely, mandamus will be even if the exercise of the duty involves discretion, so long as the existence of the duty is ministerial, and provided that the order issued does no more than require the duty to be performed, leaving the manner of its performance to the good faith discretion of the official charged." CT Page 9019
1.
The court should first deal with the motion to dismiss filed by the ACP. The motion is based on two grounds (1) the court lacks subject matter jurisdiction and (2) the complaint presents a political question.
(a)
The factual basis for the jurisdiction argument is that the defendant Keezer did not violate § 9-250 C.G.S.A. by not putting Mr. Nielsen's name on the ballot because she only has to print the names of candidates submitted to her pursuant to § 9-388 C.G.S.A. which speaks in terms of "endorsed candidates." Endorsement is the product of "party rules regulating such party and its method of selecting party endorsed candidates." Section 9-387
C.G.S.A. in turn says that the state rules of each party shall set forth the manner in which disputes over endorsement by a party are to be resolved including conflicting claims to such endorsement.
Here the defendant ACP has met statutory requirements by setting up a mechanism to resolve such disputes in its "State Rules" (Ex. 8). The executive committee of the party pursuant to the rules determined there was a dispute as to the endorsement because of the letter complaining of the endorsement submitted by a rival candidate to Mr. Nielsen (Ex. 15) and pursuant to explicit party rules the executive committee as authorized by § 9-387 resolved the dispute by in effect holding there was no "endorsed candidate" for the 24th Senate District. Therefore, so the argument goes, if § 9-387 is to mean anything, once the party resolved the endorsement dispute the way it did, the defendant Keezer had no obligation to put Mr. Nielsen's name on the ballot under § 9-250 since in fact there was no "endorsed candidate."
The basis of the argument then seems to be that clearly there was a "dispute" by any sensible definition of the term therefore the court has no jurisdiction since the legislature left the matter entirely in the hands of the political parties. Also, for good measure, there is a reference to two cases standing for the proposition that CT Page 9020 courts should be reluctant to decide issues between rival factions of political organizations. Carney v. Pilch,30 Conn. Sup. 34, 35 (1972). Reference is made to language in Alcorn ex rel Dawson v. Gleason, 10 Conn. Sup. 210, 216
(1941): "The rule appears to be that in factional controversies within a political party where there is no controlling statute or clear legal right involved, the court will not assume jurisdiction, but will leave the matter for determination by the proper tribunals of the party itself, or by the electors at the polls." The subject matter jurisdiction argument is really in many respects analytically related to the "political question argument."
If anything the Alcorn case is authoritative against the defendant ACP position. Mr. Nielsen and Mr. Hamad in fact do claim "a clear legal right" of theirs was involved which has been violated by the actions of the defendants in this case. Mr. Nielsen reads the statutory scheme and definitions in a different way from the defendant. Mr. Hamad claims his right to vote in these proceedings, and that of the people he represented, was abridged by the actions of his party. Certainly the right of association and independence of political parties must be respected, but the courts must have jurisdiction to resolve claims such as those made by the plaintiffs. The defendant is confusing arguments which go to the merits of the claim with the jurisdictional power to hear the claim in the first place. No one could deny that the court has the power to hear mandamus claims against the secretary of the state for alleged violation of the election laws; whether the mandamus should be granted is a different question.
The general rule appears to be that courts should indeed be reluctant to intervene, especially in disputes over the party nomination process, but where statutory violations are involved or questions of fraud are raised, then the courts will intervene. Wallace v. Cash,328 S.W.2d 516, 518, 519 (1959, Ky), Appeal of Wakefield, 79A 117, 119 (Pa, 1911), Allan v. Burrow, 77 P. 555, 557 (Kans., 1904), cf Myers v. Westport, 41 Conn. Sup. 295 (1989), also see Meagher v. Howell, 188 S.W. 373, 374 (Ky, 1916); contra Exparte Baxley, 496 So.2d 688, 692 (Ala., 1986),Taylor v. Tennessee State Democratic Executive Committee,574 S.W.2d 716, 717 (Tenn., 1978). (These cases will be CT Page 9021 discussed below.)
In conclusion then, the general rule seems to be that courts have subject matter jurisdiction in these types of cases and the issue is one of whether the requested relief should be granted.
(b)
As noted, the political question argument is related to the subject matter jurisdiction argument. The defendant specifically cites Pelligrino v. O'Neill, 193 Conn. 670,680 (1984) but it paints its argument with too broad a brush, if the court can be permitted a tired metaphor. The political question doctrine arises when disputes arise between two coordinate branches of government or a court is asked to intervene in an area determined to be the responsibility of the legislature or the executive — thus questions of foreign policy or in a case like Pelligrino
itself where the issue was the appointment of judges by the legislature. The fact that the state constitution gives to the legislature the power to enact laws regarding the order and manner of voting" for members of the General Assembly, Article Third, Section 8, should not mean interpretation and application of those laws by particular political parties is beyond the control or jurisdiction of the courts. If that were the case, how would the will and purpose of the legislature be enforced? The ACP executive committee or the executive committee of any other party "is most assuredly not a coordinate branch of government to which the . . . courts owe deference within the meaning of the separation of powers or the political question doctrine," dissent of Justice Marshall in O'Brien v. Brown,409 U.S. 1, 11-12 (1972).
The motion to dismiss is not granted and the court will proceed to discuss this matter on the merits.
2.
It is important to keep in mind the statutes that are important to a decision in this matter.
 Section 9-382. Party-endorsed candidates; state or district office. CT Page 9022
 The state or district convention, as the case may be, in a manner conforming with applicable law and with the rules of the party calling such convention, choose a candidate for nomination to each of the state of district offices, as the case may be. No such convention shall choose more than one candidate for nomination to any such office. Candidates so chosen shall run in the primary of such party as party endorsed candidates except as provided in Section 9-416.
 Section 9-387. Dispute as to endorsement.
 The state rules of each party shall prescribe the manner in which any dispute as to the endorsement by such party of a candidate for state, district or municipal office or for delegate or town committee member, including conflicting claims to such endorsement, shall be resolved.
 Section 9-388. Report to secretary of the state.
 Whenever a convention of a political party is held for the endorsement of candidates for nomination to state or district office, each candidate endorsed at such convention shall file with the secretary of the state a certificate, signed by him, stating that he was endorsed by such convention, his name as he authorizes it to appear on the ballot, his full residence address and the title and district, if applicable, of the office for which he was endorsed. Such certificate shall be attested by either (1) the chairman or presiding officer or (2) the secretary of such convention and shall be received by the secretary of the state not later than four o'clock p.m. on the fourteenth day after the close of such convention. If a certificate of a party's endorsement for a particular state or district office is not received by the secretary of the state by such time, such party, for purposes of section 9-416 and section 9-416a shall be deemed to have made no endorsement of any candidate for CT Page 9023 such office. If applicable, the chairman of a party's state conventional shall, forthwith upon the close of such convention, file with the secretary of the state the names and full residence addresses of persons selected by such convention as the nominees of such party for electors of president and vice-president of the United States in accordance with the provisions of section 9-175.
The statutory language is rather clear cut and does not seem to present any great mystery. The legislature seemed intent on leaving disputes over endorsements to be resolved by the political parties. Viewing the matter solely as a problem of semantics and interpretation of statutory language, the plaintiffs' position seems to require an interpretation of the word "dispute" in § 9-387 which is not warranted by the statute and would compromise the important value of party autonomy which this section of the statutes enforces. It should be noted that the statute is merely an embodiment of the traditional common law reluctance of courts to involve themselves in disputes over the nomination of candidates, cf Wallace v. Cash, supra, 328 S.W.2d at page 519.
It would seem obvious that the Setaro letter contesting the validity of the nomination of Mr. Nielsen presented a "dispute" to the party within the ordinary meaning of that term. What the plaintiffs suggest is that because of the important constitutional issues that are involved regarding the right to vote and the need to preserve the integrity of the electoral process, the secretary of the state has an obligation "to investigate whether the alleged dispute is bona fide. She ought not to have blindly accepted at face value the (ACP's) assertion that a `purported endorsement was the subject of a dispute.'" (Page 10 of plaintiffs' post hearing brief), cf State ex rel Golembeske v. White,et al., supra. Since the secretary declined to so investigate the matter and the election is imminent, mandamus relief is appropriate.
In effect the secretary of the state would have to ascertain whether there was any merit to the way a dispute was decided by the party — what else could the plaintiffs' position mean if the filing of the complaint by Setaro CT Page 9024 itself is not enough to raise a "dispute under § 9-387? Should the secretary of the state investigate all these matters, investigate only when there is some evidence that there was no real "dispute" under party rules but the dispute was trumped up as the plaintiffs claim here, or should fairly convincing evidence be presented before the investigation need be made? What are the investigative powers the secretary has to perform this role — does she have subpoena power, contempt power? It will not do for the plaintiffs to avoid all these practical problems raised by the claim for the recognition of the right to mandamus relief in this area by saying in this case a mandamus must issue because the election is imminent.
Turning from questions of statutory language interpretation, it is true that courts will intervene in party affairs in cases of fraud or clear violation of law, see cases cited.
But there is no claim made here for example that Mr. Setaro was put up by the executive committee to write his letter of complaint or actively conspired with the committee to have the Hamad endorsement of Nielsen vacated. Mr. Setaro protested the endorsement the night of the convention. Neither is this a case where mandamus should lie because the party violated a clearly worded statutory provision directly applicable to the facts of this case regarding the right of a person to be placed on a ballot, cf Myers, et al. v. Westport et al., 41 Conn. Sup. 295
(1989).
Section 9-382 says that parties in conformity "with applicable law and with the rules of the party" shall choose their candidates. Section 9-387 talks about disputes over endorsements and sets forth the mechanism by which such disputes should be resolved. Reading these two statutory sections together they cannot be read to mean that the dispute resolution power recognized in § 9-387
will in effect only be recognized as appropriate if the secretary of state through investigation or a court through later review of the evidence presented finds that the party gave an interpretation of party rules these outside state authorities agreed with or thought appropriate. Not only would that seem to defeat the whole purpose of giving the power of dispute resolution to the parties but it would CT Page 9025 raise a serious question about infringement of the right of association, Tashjian v. Republican Party of Connecticut,479 U.S. 208, 214 (1980), Democratic Party of the UnitedStates v. Wisconsin ex rel La Follette, 450 U.S. 107, 122
(1981), Cousins v. Wigoda 419 U.S. 477, 487 (1975), Naderv. Schaffer, 417 F. Sup. 837, 844 (1976).
But the claim that the court can issue a mandamus in this case would have to be based on the ancillary claim that the state acting through its secretary or its courts can assume to itself the very kind of power to review just discussed.
I will now refer to some of the factual allegations made by the plaintiffs and evidence produced at trial that there really was no "dispute" here — the party rules were clear that Hamad did not need a second. This discussion may seem inconsistent with just concluded observations. However, I suppose it is true that circumstances can be imagined where the executive committee of a party in resolving a nomination dispute under § 9-387 so obviously ignores party rules that it would rise to that level of fraudulent or collusive behavior requiring court intervention. In such a situation the secretary of the state might be warranted in finding the resolution of a dispute which resulted in removing party endorsement of a particular candidate void under § 9-382. I will also review these facts as a preface to a concluding discussion about the statutory scheme.
There was evidence presented and the court finds that Mr. Nielsen approached ACP authorities and asked them how he could secure party endorsement. He was told that he should contact Mr. Hamad. Neither he nor Mr. Hamad were told about the inability of Hamad to nominate a candidate not approved by the executive committee without a second. It is also true that the executive committee of the ACP did not decide to back Mr. Setaro however until after Nielsen contacted ACP authorities. Sharon Gibbs was the delegate for the 40th Senate District. She was told to nominate and endorse a candidate other than the one recommended by the executive committee — she was told this by the party parliamentarian. Ms. Gibbs also said that she was told by the party chairperson that the reason why her unseconded nomination and endorsement of a candidate other than the CT Page 9026 party approved candidate was invalidated was to have the party's invalidation of the Nielsen endorsement be consistent.
Roberts Rules of Order were adopted as part of the convention rules and those rules do not appear to require a second for a nomination in a small convention of this type.
On the other hand various party documents created before this dispute arose seem to contemplate that nominations at the conventions of the party are to be seconded, see Ex. 9, ACP district convention rules and Ex. 7, Convention Procedures, also see Ex. 8, ACP State Rules. The very minutes of the convention which record the activity of the convention with regard to nominations are printed forms which refer to nominations being seconded, see Ex. 10 and 11. I am aware of the cogent arguments of the plaintiffs regarding the irrelevance of these documents to resolve the merits of the dispute but they do have a bearing on the issue of whether there was a conscious attempt to misinterpret party rules or just a state of confusion over those rules. Also, Mr. Halloran's letter of legal advice concerning the endorsement dispute, Ex. 16, and his procedural recommendations on discussing it, Ex. 17, represent internal party documents which for all anyone knew would never come to the attention of the court. Yet they do strike the court as candid appraisals of the legal situation presented by the endorsement dispute and were requested by the party chairperson prior to the executive committee meeting of August 2, 1994 where the Nielsen endorsement was invalidated. The record is mixed. There is some evidence that has been presented which might tend to show the party rules regarding seconding were interpreted the way they were not on the merits but to deprive Mr. Nielsen of the endorsement after the fact. But there is evidence presented to the contrary. In such a case where there is no allegation of corruption in the traditional sense of that term, or for example racial or sexual bias, the secretary of the state by investigative procedure or the courts by a truncated hearing preliminary to a mandamus order should not engage in a will of the wisp endeavor to delve into and determine the motives on which people acted. Again the court is being asked to interpret the rules of the party — even assuming people acted with the wrong motive that does not mean the final CT Page 9027 interpretation is obviously wrong that the party gave to those rules.
Analyzing the statutory scheme as it presently exists, and the mandamus case law, the court will not issue a temporary or permanent mandamus or order the ACP to withdraw its letter to the secretary indicating there was no endorsement for the 24th Senate District.
3.
This does not end the discussion, at least for the court. Mr. Nielsen and Mr. Hamad have a colorable claim that the party rules were interpreted incorrectly resulting in the unfair invalidation of the Nielsen endorsement. The right of association is an important one and the right of the legislature to act in the area of party regulation is obvious and important. But the right of the people to a fair electoral process is important too. Mr. Hamad did represent people; their right to have their delegate nominate a person of his choice in accordance with party rules is obvious. Although the issues raised in UnitedStates v. Classic, 313 U.S. 299 (1941) are not the issues before this court some of its references to the electoral process are important; in fact it is true that the primary and nomination process do have an effect on the "free exercise of the right to choose the representatives"; that is why at the federal level Congress has inquired into the conduct of primaries, id. p. 319 n. 3. The court must agree with the plaintiffs' contention in their brief that in our "electoral system, delegate selection is a basic step fundamental to our democratic system enabling local electors to nominate and elect local candidates. SeeAlcorn ex rel Dawson v. Gleason, 10 Conn. Sup. 210, 218." (Post hearing brief page 11.)
What concerns the court in this case is that we have a statutory scheme that in a dispute such as the one now before the court affords no protection to Mr. Hamad's rights as a representative of the people who voted for him. The right of association is an important one but so is the right to a fair electoral process. The only way to constitutionally accommodate these claims is to have a process that does not permit state intervention in the affairs of a political party but at least gives people like CT Page 9028 Mr. Hamad and Mr. Nielsen a right to be heard. Nowhere do the state statutes require this and thus the ACP party rules do not give contestants in a § 9-387 dispute the right of notice, the right to be present at a hearing and present their position, or the right to appeal the decision made. Some states have accommodated the important competing interest involved by requiring political parties to set up a hearing procedure to resolve nomination disputes; it is only because of that apparently that the courts of these states do not intervene in the party disputes through the use of mandamus or injunctive relief, see Ex parte Baxley, 496 So.2d 688 (1986), cf Taylor v.Tennessee State Democratic Executive Committee, 574 S.W.2d 716
(1978), also see State v. Crittendon, 64 S.W. 162, 169
(Mo., 1901).
Why then should not I issue the mandamus? To do so would from my perspective involve a finding that the present statutory scheme is unconstitutional, since I know of no way to judicially amend the statutory scheme so as to provide notice and a right to be heard as a necessary part of state party rules. I do not think a trial court should hesitate to make such a finding but in this particular case it would not be appropriate for several reasons. The nature of this case is such that I only received it last week, the last hearing was a few days ago and I have to make an immediate decision if the plaintiffs are not to be deprived of their right to be heard and the defendants are to have a right to appeal any decision I make in a timely and orderly fashion. Operating under these time constraints I do not believe I have had enough time to explore the constitutional issues and relevant cases so that at least in my own mind I can definitively determine that the statutory scheme is unconstitutional. I also know that my failure to act on these issues will not prejudice the opportunity to have a hearing on these matters since the parties plan to go immediately to the appellate court. Even more importantly the matters that concern me were not briefed or argued by the parties and it would be unfair to the defendants for me to rule without giving them a further chance to be heard. But if I continue the case for that purpose the delay will prejudice both sides and might prevent lower or appellate court action before the ballot printing deadline. In conclusion, I'm concerned about the issues raised by the plaintiffs but believe under the CT Page 9029 present statutory scheme they are not entitled to temporary or permanent mandamus relief and do not believe it would be appropriate at this juncture for me to hold the statutory scheme unconstitutional or otherwise subject to judicial amendment and thereby give mandamus or injunctive relief.
Corradino, J.